IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

JAYSON ANTHONY SHOOK                                                          PLAINTIFF

V.                                      6:24-CV-06163-MEF

FRANK BISIGNANO, COMMISSIONER,
SOCIAL SECURITY ADMINISTRATION                                               DEFENDANT

### MEMORANDUM OPINION

Jayson Anthony Shook ("Plaintiff") seeks judicial review of the decision of the Commissioner of Social Security ("Commissioner") denying his application for Social Security disability insurance benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. § 423(d)(1)(A). (ECF No. 2). Proceeding *pro se*, Plaintiff argues that he was deprived of a full and fair hearing and that the Commissioner's decision is not supported by substantial evidence.[1] (ECF Nos. 2, 13). After careful consideration of the entire record and briefing of the parties, the Court finds no error and concludes that substantial evidence supports the determination that Plaintiff was not disabled during the relevant period.

### I.    BACKGROUND

Plaintiff filed an application for disability benefits, alleging disability beginning June 27, 2022, due to mood disorder, generalized anxiety disorder ("GAD"), panic disorder, obsessive-compulsive disorder ("OCD"), Tourette's syndrome, attention deficit disorder ("ADHD/ADD"),

---

[1] At the outset, the Court notes that Plaintiff was represented by counsel during the proceedings below and in the instant proceeding. On motion, counsel was permitted to withdraw from representing Plaintiff after filing the Complaint in December 2024. (ECF Nos. 2, 10-11). Plaintiff was afforded additional time to obtain new counsel, or to prepare his own Appeal Brief. (ECF No. 11). He elected to file a *pro se* Appeal Brief, which the Court liberally construes. (ECF No. 13). *See Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004) (stating that pro se filings are to be liberally construed).

carpal tunnel syndrome ("CTS"), human-immunodeficiency-virus infection ("HIV"), supraventricular tachycardia ("SVT"), chronic-pain syndrome, hyperthyroidism, and migraine headaches. (ECF No. 8, pp. 16, 195-196, 214-225). After the denial of his application, Plaintiff appeared with his representative, attorney Shannon Hughes Carroll, at a telephonic hearing held on January 3, 2024, before Administrative Law Judge Mark Schaefer. (*Id.*, pp. 68-88, 98). ALJ Schaefer received testimony from Plaintiff and from a vocational expert ("VE"), and Plaintiff's medical records were received in evidence. (*Id.*, pp. 30-67).

### A.    *Shook's Testimony*

Plaintiff testified that he was 47 years old, lived alone, and had previously worked at a local grocery store and at a convenience store, mainly as a cashier. (ECF No. 8, pp. 33-34). He worked at the grocery store for nine years but stopped working after he experienced SVT and "had to go the ER" where, according to Plaintiff, his heart was stopped and then restarted. (*Id.*, p. 34). He related the SVT event to anxiety, saying that he had long experienced "anxiety attacks," but the episodes had gotten longer as he got older, and he learned that SVT causes anxiety. (*Id.,* pp. 34-35). Plaintiff testified that he takes medication that controls his anxiety "for the most part[,]" but that he still has an attack every week or every week-and-a-half and that the attacks make his heart race so that he must sit down. (*Id.,* p. 37-38).

Plaintiff also said that following the SVT event, he began experiencing an inability to focus and was diagnosed with adult ADHD/ADD. He added that "the Tourette's, the autism and bipolar" also "escalated" after this event so that he "just couldn't focus on anything anymore after that." (ECF No. 8, pp. 34-35, 39). He said his previous manager at the grocery store had given him "a lot of slack on completing tasks and staying on track" but his new manager did not. Plaintiff

2

decided that he would not return to work after he and the new manager had a verbal "altercation" in which the manager said he would have fired Plaintiff long ago.  (*Id.,* pp. 35-36, 39, 59).

Plaintiff testified that Tourette's syndrome causes him to fidget with his fingers and to clear his throat, but he does not take medication for it. (ECF No. 8, pp. 40-41).  He also said he was "partially OCD" and had to count things "in threes and . . . fours" and wanted things "to be equal and line up and straight[.]" (*Id.*).  He said he takes medication for bipolar disorder and for "extreme pain" in his cervical spine, adding that a neurologist had diagnosed him with "[n]arrowing of the ... spine" and that he experiences neck and spine pain "24 hours a day." (*Id.,* pp. 41-43).  He said that his spine condition also causes migraine headaches, which he experiences daily, and that an ablation procedure performed by a pain clinic "didn't work at all" and made his pain worse. (*Id.,* pp. 42-43, 49).  Although he continues to take medication for his pain, including pain caused by his migraine headaches, he said the medication only reduces the pain "a little bit," and does not resolve it.  (*Id.,* pp. 43-47).  He said he had tried physical therapy, but it created more pain, and he saw no reason to return to the neurologist.  (*Id.,* pp. 47-48).

Plaintiff has been treated for HIV infection since 2009, and he said that although the virus remains undetectable, he had been "on a roller coaster since day one" and that his CD4 levels "fluctuate up and down and up and down." (ECF No. 8, p. 50).  He said he also underwent a nerve-conduction study in 2021, which reflected carpal tunnel syndrome in both wrists, but he had not addressed this condition.  (*Id.*).  He also said that he takes daily medication for thyroid dysfunction and that it is effective.  (*Id.,* p. 51).

When asked about his activities and social connections, Plaintiff replied that he belonged to no clubs or organizations, kept to himself mostly, but did have a few friends whom he called or texted occasionally.  He said he sometimes stutters or has difficulty getting a word out, and that he

3

could go three to five days without leaving the house.  (ECF No. 8, pp. 57-58).  He has two dogs, drives a car, has obtained a handicapped decal, and drives mostly to the store but does only minimal shopping.  (*Id.,* pp. 52-55, 57).  He thought he could lift 10 pounds but not repeatedly, could sit "[m]aybe 45 minutes or an hour[,]" and could walk "about 25 feet" before he would have to stop and rest.  (*Id.,* pp. 54-55, 60).

### B.    *Medical Records*

Prior to his alleged onset date, Plaintiff established care at myHealth Direct Primary Care Clinic, where he was seen for several conditions during the relevant period, including HIV, GAD, recurrent major depressive disorder ("MDD"), tachycardia, headaches, chronic pain syndrome, insomnia, ADHD/ADD, Tourette's syndrome, and OCD.  (ECF No. 8, pp. 420-442, 549-570).  On referral from his primary-care provider, Plaintiff saw Dr. Anudeep Surendranath at CHI St. Vincent Neurology Clinic on April 14, 2021, for complaints of headache and radiating neck pain.  (ECF No. 8, pp. 393-395).  After an examination, Dr. Surendranath assessed cervical radiculopathy and chronic migraine.  (*Id.*, pp. 394-395).  He prescribed gabapentin and divalproex, brand name Depakote, and ordered imaging of the brain and of the cervical spine.  (*Id.,* pp. 531-535, 544-546).  At a follow-up appointment in June 2021, Plaintiff reported that although his headaches had improved with the prescribed dosage of Depakote, he continued to experience daily headache pain, which he rated as 6-8/10.[2]  He reported that he also continued to experience neck pain that radiated to his upper extremities bilaterally, despite having tried gabapentin and physical therapy.  (*Id.,* p. 358).  MRI of Plaintiff's brain reflected minimal supratentorial T2 hyperintense lesions and mild

---

[2] Progress notes document this rating as "68/10."  The undersigned assumes this is a typographical error, as Plaintiff consistently rated his pain as ranging from a minimum of 6/10 to a maximum of 9/10 at other encounters.  (ECF No. 8, pp. 350, 353, 354, 369, 372-373, 457, 473, 502, 516, 525, 539).

diffuse cerebral volume loss. (*Id.,* pp. 358, 546). MRI of his cervical spine revealed multilevel degenerative changes with neural foraminal narrowing and no significant spinal canal narrowing. (*Id.,* pp. 358-359, 544-546). Following an examination, Dr. Surendranath increased Plaintiff's dosage of Depakote, maintained his dosage of gabapentin, and referred him to CHI St. Vincent Neurosurgery Clinic. (*Id.,* pp. 359, 364-365).

Plaintiff saw neurosurgeon, Keith Norvill, D.O., on August 2, 2021, and reported numbness and tingling in both arms and hands, worse in the right upper extremity than in the left. (ECF No. 8, pp. 373-376). He also reported neck pain in the back of his head, indicating that he had experienced left-sided headaches in the posterior-temporal region for about four years. He rated his pain 8/10 and said it was constant. (*Id.,* p. 373). His physical examination was largely normal, reflecting intact motor strength in the bilateral upper extremities and hands, no atrophy, and negative Tinel, Phalen, and Hoffmann signs, but his reflexes were 1/4 and tenderness was noted in the suboccipital and left-sided trapezius distribution. (*Id.,* pp. 355, 374). Electromyography (EMG) performed in May 2021 did not demonstrate a radicular pattern but showed evidence of bilateral carpal tunnel syndrome and left ulnar neuropathy at the elbow and wrist. (*Id.,* p. 375). Dr. Norville prescribed a Medrol Dosepak, to be followed with diclofenac, and referred Plaintiff for evaluation by the orthopedic hand-service team. (*Id.,* pp. 372, 376).

On August 11, 2021, just over a week following his first visit with the neurosurgeon, Plaintiff saw his primary-care provider and reported that he had had multiple scans and was told that he had some narrowing in his neck. Although he had already seen the neurosurgeon once and would return to see him again the next month, Plaintiff told his primary-care provider that the neurologist wanted him to see a neurosurgeon but that he could not afford to do so and "wishe[d] someone would send him to pain management." (ECF No. 8, p. 441). He noted that CHI had

refused to refill a prescription because he had been using it as a "maintenance" drug and had not offered to send him to pain management. (*Id.*). The following month, on September 15, 2021, Plaintiff returned for a follow-up with the neurosurgeon. Plaintiff reported that he was working at a desk job and had received no relief or improvement from the diclofenac or Medrol. He rated his neck pain 8/10, and described it as pressure, "tight" and persistent with neck or arm movement. (*Id.,* p. 350). Dr. Norville reviewed the relevant imaging again and concluded that, despite his "pain symptom complex," Plaintiff remained neurologically stable. (*Id.,* pp. 351-353). He prescribed a short course of Fiorinal, and again recommended evaluation of Plaintiff's wrists and elbows by the orthopedic hand-service team. He concluded that neurosurgical care was not needed, and he discharged Plaintiff that day. (*Id.,* pp. 352-353).

The following day, Plaintiff's primary-care provider referred him to Pain Treatment Centers of America, where Plaintiff began treatment in November 2021. (ECF No. 8, pp. 438, 539-543). At his initial visit, Plaintiff complained of neck pain, head pain, and lower back and leg pain. (*Id.,* p. 539). Dr. Vadim Petrov-Kondratov reviewed Plaintiff's cervical MRI results from June 2021, and, due to a discrepancy between Plaintiff's pathology and his complaints, Dr. Petrov-Kondratov recommended a diagnostic cervical medial branch block to determine the pain source. (*Id.,* p. 542). He also ordered an X-ray of the lumbosacral spine, requested physical therapy records from CHI, and prescribed hydrocodone for pain.[3] (*Id.,* pp. 542-543).

Following the first cervical medial branch block procedure on December 7, 2021, Plaintiff reported a positive response, with over 80% overall improvement in pain and an ability to do more activity with less pain. (*Id.,* pp. 516, 525-526). A second procedure was performed two weeks

---

[3] The transcript contains no medical records demonstrating that Plaintiff engaged in physical therapy during the relevant period.

later, on December 21, 2021. (*Id.,* pp. 516-517). Plaintiff reported that the second procedure also had reduced his pain over 80%, and he was scheduled for radiofrequency ablation neurotomy, which was performed on March 24, 2022. (*Id.,* pp. 502, 504-505). At a follow-up on June 30, 2022, Plaintiff reported that the neurotomy had reduced his chronic pain over 80%, but he indicated that the pain was not controlled on his current regimen. (*Id.,* pp. 473-476). He underwent a cervical ESI that day and his hydrocodone prescription was refilled; however, Plaintiff also was warned about an inconsistent drug-test result from his previous encounter. (*Id.,* p. 476-477). Plaintiff had tested positive for Tramadol, which was not currently prescribed for him, and he was warned that his medication would be decreased or stopped if inconsistent drug tests continued. (*Id.,* p. 476). Plaintiff also was warned about multiple missed and rescheduled appointments and was informed that he would be "resigned from care" if the behavior continued. (*Id.*)

Plaintiff returned to the pain-management clinic on August 15, 2022, and reported that his pain had not changed significantly since his last visit but was manageable with medication. (*Id.,* pp. 457, 460). Because results from Plaintiff's drug test during the June 2022 encounter were positive for methamphetamine, however, Plaintiff's hydrocodone prescription was suspended. (*Id.,* p. 460). He was tested again at the August 2022 encounter, and the results were positive for, *inter alia*, methamphetamine and marijuana. (*Id.,* p. 452). The record reflects no further treatment at this clinic.

The following month, Plaintiff's primary-care provider referred him to Charl Buxton at Safe Harbor Behavioral Health for medication management of depression, anxiety, obsessive-compulsive disorder, and ADHD/ADD. (ECF No. 8, pp. 564-565). After an initial evaluation, Plaintiff was assessed with autistic disorder, moderate bipolar disorder, chronic post-traumatic stress disorder, mixed obsessional thoughts, anxiety state (finding), and MDD. (*Id.,* pp. 573-574).

With limited exceptions, progress notes from Plaintiff's encounters during 2023 reflect normal mental-status examinations, specifying, *inter alia*, good insight and judgment, intact memory, motor activity within normal limits, no impulsive behavior, and attention/concentration within normal limits. (*Id.,* pp. 574, 577, 580, 583, 586-587, 590). He was noted to be hyperverbal and stuttering on three occasions, and exhibited poor insight on one occasion, and impaired memory on another. (*Id.,* pp. 577, 583, 586-587). In the final encounters before Plaintiff's hearing, he reported that his methylphenidate, brand name Ritalin, was "very effective," that he felt "motivated and organized" since he began taking it again, and that he was "just doing more of the things [he] used to do." (*Id.,* pp. 582-583, 587). He noted it was wearing off too soon, however, and he was to be considered for a possible change in medication. (*Id.,* p. 591). He also obtained a change in his mental-health medication from duloxetine, brand name Cymbalta, to venlafaxine, brand name Effexor, which he later reported was "really good." (*Id.,* pp. 587, 591).

Records dated during the same period document normal findings during Plaintiff's examinations by primary care. (*Id.,* pp. 561, 563). His SVT, which was treated with atenolol, was noted to be stable. (*Id.,* pp. 561-562). He reported that his anxiety, depression, OCD, and Tourette's had been better, that he does not take the Risperdal prescribed for Tourette's because it would require cessation of Ambien and trazodone, which he said worked well to control his insomnia. (*Id.,* pp. 582-583). He reiterated that his medication for ADHD/ADD was "very effective," with no side effects. He also indicated his headaches had improved since he had a tooth extracted and received the cervical injections from pain management. (*Id.,* p. 562-563). And, consistent with Plaintiff's testimony, the lab results reported by primary care show his thyroid condition, diagnosed in March 2022, was stabilized with medication. (*Id.,* pp. 51, 424, 430, 564).

8

### C.    VE's Testimony

In addition to the foregoing testimony and evidence, the ALJ asked the VE, Dianne Smith, to assume a hypothetical claimant of Plaintiff's age, education, and work experience who is limited to light work, frequent fingering and handling in the upper extremities, cannot tolerate work tasks involving constant vibrations such as drills or hammers, and is further limited to work which is simple, routine, repetitive, involving simple work-related decisions, and only occasional interaction with coworkers, supervisors, and the public. Ms. Smith testified that this person could not return to the past work that Plaintiff had described, but he could work as an assembler, with over 13,000 jobs available in the national economy, and as a small-product assembler, with over 28,000 jobs available in the national economy. (ECF No. 8, pp. 63-65). The ALJ also asked Ms. Smith to assume the same hypothetical claimant with the additional requirement that he would experience three unscheduled absences per month. Ms. Smith testified that this person could perform no work in the national economy. (*Id.,* pp. 65-66).

### D.    ALJ's Decision

The ALJ considered the entire record and found that Plaintiff had not engaged in substantial gainful activity since June 27, 2022, and that through the date of the ALJ's decision on February 2, 2024, he had the severe medically determinable impairments of chronic pain syndrome, carpal tunnel syndrome, migraine headaches, anxiety disorder, posttraumatic stress disorder, depressive disorder, and attention deficit hyperactivity disorder. (ECF No. 8, p. 18). The ALJ concluded that Plaintiff's impairments of HIV, SVT, thyrotoxicosis, and Tourette's, which had been controlled or were stabilized with medication management, were not severe. (*Id.,* pp. 18-19). He further concluded that the evidence did not support a finding of presumptive disability under the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.,* pp. 19-20). After considering all

9

the relevant evidence, including the objective medical evidence, observations of treating physicians and others, and Plaintiff's own descriptions of his limitations, the ALJ determined that Plaintiff retained the functional capacity to perform a range of light work as defined in 20 C.F.R. § 404.1567(b). He specified that Plaintiff can lift and carry 20 pounds occasionally, 10 pounds frequently; can sit for six hours in an eight-hour workday, and stand/walk for six hours in an eight-hour workday; can frequently finger and handle, but cannot perform work involving constant vibration, such as with drills and hammers; and is further limited to jobs involving simple tasks, with no detailed or complex instructions, and only incidental contact with the public. (*Id.*, pp. 20-23). Considering Plaintiff's age, education, and work experience, and with the assistance of VE Smith's testimony, the ALJ identified existing jobs in the national economy which Plaintiff could perform and determined that he was not disabled.

On November 20, 2024, the Appeals Council denied Plaintiff's request for review. (ECF No. 8, pp. 1-5). Plaintiff subsequently filed this action, which is before the undersigned by consent of the parties. (ECF Nos. 1, 7). Both parties have filed briefs, and the case is ripe for decision. (ECF Nos. 13, 15).

## II.    APPLICABLE LAW

Under 42 U.S.C. § 405(g), this Court must determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). The threshold for substantial evidence is not high. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). It is more than a mere scintilla of evidence, but less than a preponderance, meaning it requires "only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Kijakazi*, 22 F.4th 769, 771 (8th Cir. 2022) (quoting *Biestek*, 587 U.S. at 103). "The substantial-evidence standard allows considerable latitude to

10

administrative decision makers" and "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984). Thus, a reviewing court considers both evidence that detracts from the ALJ's decision and evidence that supports it, *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011), but if the decision is supported by substantial evidence on the record as a whole, it must be affirmed even if substantial evidence also exists for the opposite decision, *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997).

A claimant for Social Security disability benefits bears the initial burden of proving his disability. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(5) (stating that an individual is not considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which … has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

To determine whether a claimant is disabled, the Commissioner's regulations require the application of a five-step sequential evaluation process, considering: (1) whether the claimant has engaged in substantial gainful activity since filing the claim; (2) whether he has a severe physical or mental impairment or combination of impairments; (3) whether any such impairments meet or equal a listed impairment; (4) whether the claimant's limitations from his impairment(s) prevent him from performing past relevant work; and, if so, (5) whether he is able to perform other work

in the national economy given his age, education, work experience, if any, and residual functional capacity ("RFC").[4]  20 C.F.R. § 404.1520(a)(4).  If the claim is not resolved at steps one through four, the fact finder will consider the claimant's age, education, work history, and RFC to determine, at step five, whether he can make an adjustment to other work.  20 C.F.R. § 404.1520(a)(4)(v).

## II.    DISCUSSION

In the Complaint, Plaintiff asserts that the Commissioner's decision is not supported by substantial evidence and should be reversed for an award of benefits or remanded for additional proceedings.  (ECF No. 2, pp. 2-3).  In his *pro se* Appeal Brief, Plaintiff echoes this assertion, asking the Court to "grant [his] claim on record" because his medical "conditions worsened [and] multiplied with new disabilities" after he experienced the SVT attack, which occurred in 2019, and he has difficulty getting through the day with the medications he takes.  (ECF No. 13, p. 2; ECF No. 8, p. 349).  Plaintiff's Appeal Brief also identifies several discrete issues concerning Plaintiff's general dissatisfaction with the disability-determination process, specifically his dissatisfaction with his retained counsel, with the ALJ, and with Disability Determination Services ("DDS").  (ECF No. 13, pp. 1-2).  Generously construed, this argument relates to the overall procedural fairness of the proceeding.  The Commissioner responds that the ALJ gave full and fair consideration to Plaintiff's claim for benefits, properly evaluated the medical evidence and Plaintiff's subjective complaints, and that the decision is supported by substantial evidence.  (ECF No. 15, pp. 5-8).  The Court agrees.  Liberally construing Plaintiff's filings as challenging the RFC determination, the Court concludes that Plaintiff was afforded a full and fair hearing, and

---

[4] A claimant's RFC is assessed between steps three and four and is used to evaluate the disability claim at steps four and five.  20 C.F.R. § 404.1520(a)(4),(e).

substantial evidence supports the ALJ's RFC finding and his conclusion that Plaintiff was not disabled. *See Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015) (standard of review).

### A.    *Full and Fair Proceeding*

Plaintiff initially suggests that he was denied a fair hearing because: (1) the ALJ "was talking so loudly and aggressively" toward Plaintiff during his testimony and would not give him a sufficient opportunity to respond before moving on to another topic; (2) Plaintiff's lawyer knew nothing about his case, had not spoken to him before the hearing, and did not speak on his behalf or attempt to represent him at the hearing; and (3) DDS was dilatory in processing his DIB claim and did not include a separate claim for Supplemental Security Income.  (ECF No. 8, pp. 1-2).  A fair trial in a fair tribunal is a basic requirement of due process.  *Withrow v. Larkin*, 421 U.S. 35, 46 (1975).  This principle applies to administrative agencies which adjudicate as well as to courts. *Id.*  It is, thus, settled law that due process requires an ALJ to ensure the development of a record that is adequate to allow an informed decision about whether the claimant is disabled.  *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).  Absent a showing of unfairness or prejudice resulting from an incomplete record, however, the court will not remand for further proceedings.  *See Phelan v. Bowen*, 846 F.2d 478, 481 (8th Cir. 1988) (remand of Social Security case not warranted for claim of a deficient hearing absent showing of incomplete record resulting in unfairness or prejudice); *Highfill v. Bowen*, 832 F.2d 112, 115 (8th Cir. 1987) (same).

Here, the record does not support Plaintiff's allegations of a deficient hearing, much less demonstrate prejudicial error.  Plaintiff's hearing lasted just over an hour, and most of that time was allotted to Plaintiff's testimony, which spans 30 pages of the 67-page transcript.  (ECF No. 8, pp. 32-67).  *See Battles v. Shalala*, 36 F.3d 43, 45 (8th Cir. 1994) (the length of a hearing is a relevant consideration when considering whether the ALJ fully and fairly developed the record).

It is evident from a review of those pages that the ALJ asked open-ended questions of Plaintiff, often paraphrased Plaintiff's answer to ensure he understood it, and occasionally sought clarification, allowing Plaintiff to elaborate on his answers.  (ECF No. 8, pp. 32-62).  Thus, Plaintiff's suggestion that the ALJ's demeanor intimidated him and that his manner of questioning prevented Petitioner from answering questions fully is belied by the record.  Further, even if the ALJ spoke "loudly and aggressively," and abruptly moved onto other topics, as Plaintiff alleges, ALJ's are presumed to be impartial.  *Partee v. Astrue*, 638 F.3d 860, 865 (8th Cir. 2011).  Mere "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women … sometimes display[,]" will not suffice to overcome that presumption.  *Litecky v. United States*, 510 U.S. 540, 551, 555-556 (1994).  Further, "[a] judge's ordinary efforts at courtroom administration … remain immune" from claims of bias.  *Id.*

Plaintiff's complaints about his counsel also find no support in the record.  In contrast with his allegations that his counsel knew nothing of his case and that he had no contact with counsel before the hearing in January 2024, the record reflects that on October 26, 2022, both Plaintiff and his attorney signed a contract whereby his attorney agreed to represent him on a contingency-fee basis in connection with his disability claim. (ECF No. 8, pp. 103-104).  On the same day, Plaintiff and his attorney also signed a form requesting a hearing by an administrative law judge as well as Social Security Form 1696, wherein Plaintiff formally authorized the appointment of his attorney as his representative in the Social Security Proceedings.  (*Id.*, pp. 94-102).  Plaintiff subsequently told his behavioral-health provider that he had received some paperwork from Social Security and had an appointment with his lawyer the following Monday to go over other paperwork and to get help with the paperwork he received.  (*Id.,* p. 591).  Additionally, at the administrative hearing it was noted that Plaintiff's counsel had submitted Plaintiff's pharmaceutical records before the

14

hearing and had prepared evidentiary exhibits which were admitted in evidence. (*Id.*, p. 32). The ALJ thanked counsel for her "attention to detail and [for] getting everything in timely" and told Plaintiff his counsel "does a very good job in her representation" and that "[s]he knows the file[.]" (*Id.*, p. 32-33).

Further, counsel did not stand mute at the hearing, as Plaintiff suggests. During the ALJ's questioning of Plaintiff, she interjected on Plaintiff's behalf, suggesting the ALJ was mistaken in his statement that Plaintiff voluntarily ended his employment. (*Id.*, p. 36). Further, it was through his counsel's questioning that Plaintiff was able to provide additional, detailed information about his impairments and limitations and to clarify the reason he stopped working. (*Id.*, pp. 56-61). After almost an hour of testimony from Plaintiff, the ALJ limited counsel to two additional minutes to complete her questioning because the VE had not yet testified, and another matter was scheduled directly after Plaintiff's hearing. (*Id.*, p. 61-62). Counsel completed her questioning, and neither she nor Plaintiff indicated there was any information that they had been unable to present. (*Id.*) Thus, the record is in tension with Plaintiff's claims that his attorney knew nothing about his case, did not engage with him before the hearing, and did not speak on his behalf or attempt to represent him at the hearing.

Finally, Plaintiff's suggestion that DDS representatives were obligated to process a claim for SSI on his behalf, but failed to do so, also finds no support in the record. Plaintiff acknowledges that DDS assisted him with completing his application for DIB. (ECF No. 13, p. 1). He states that DDS called him on three different occasions and spoke to him for 30 minutes each time to record his responses for purposes of completing his application. (*Id.*). Consistent with this assertion, the record shows that Plaintiff provided information to DDS representatives on three separate occasions between August 16 and 19, 2022, and when asked whether he intended to apply for SSI,

15

Plaintiff said he did not. (ECF No. 8, pp. 196, 198, 223). In his Appeal Brief, Plaintiff concedes that it was only after he completed the application process that he asked about SSI, hoping to receive supplemental income while he waited for the decision on his DIB claim, but he was told these payments were available only for those who were likely to succeed on their claims. (ECF No. 13, p. 1). By this time, it was too late for Plaintiff to apply for SSI in connection with his DIB claim.[5] *See* 20 C.F.R. 416.350 (setting forth the requirements for treating a title II application as an application for SSI benefits).[6] Further, for reasons given in the following discussion concerning Plaintiff's RFC, *infra*, the ALJ properly concluded that Plaintiff was not disabled. For that reason, Plaintiff cannot show prejudice from any alleged failure on the part of DDS in the processing of an application for SSI. In sum, Plaintiff's allegations of unfairness in the disability-hearing process demonstrate no error, much less prejudicial error.

---

[5] Federal regulations allow expedited payments of SSI for up to six months while a claimant waits for DDS to make a final decision on his claim, but eligibility for these payments is based on the severity of a claimant's condition, the evidence available at the time, and the high likelihood that his claim will be approved. *See* SSA Home | Supplemental Security Income (SSI) | SSI Additional Information | Understanding SSI | Expedited Payments https://ssa.gov/ssi/text-expedite-ussi.htm (last accessed March 25, 2026). Symptomatic human immunodeficiency virus (HIV) infection may qualify for these presumptive-disability payments. *Id.* However, as noted in the following discussion concerning Plaintiff's RFC, *infra*, Plaintiff's HIV infection was undetectable throughout the relevant period, and his CD4 levels were stable. Further, one must apply for SSI benefits to be considered for expedited payments. As noted, Plaintiff did not apply for SSI.

[6] Under 20 C.F.R. § 416.350(b), if an applicant "does not file an application for SSI on a prescribed form when SSI is explained to him or her, [the agency] will treat his or her filing of an application for [DIB] benefits as an oral inquiry about SSI, and the date of the [DIB] application form may be used to establish the SSI application date *if the requirements of §416.345(d) and (e) are met*." 20 C.F.R. §416.350(b) (emphasis supplied). One of the stated requirements is that the claimant must file "an application on a prescribed form within 60 days after the date of the notice" the agency sends to the claimant informing him of the need to file a written SSI application. 20 C.F.R. § 416.345(d). *Schweiker v. Hansen*, 450 U.S. 785, 790 (1981) (holding that even where the agency has misinformed a claimant that he is ineligible for SSI benefits, a court is "no more authorized to overlook the valid regulation requiring that applications be in writing than it is to overlook any other valid requirement for the receipt of benefits").

### B.    *Assessment of Plaintiff's Subjective Complaints and RFC*

When evaluating the intensity, persistence, and limiting effects of a claimant's symptoms, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record."  Social Security Ruling ("SSR") 16-3p, "Evaluation of Symptoms in Disability Claims," 2017 WL 5180304, at 4 (Oct. 25, 2017).  In making this assessment, the ALJ must consider several factors, including the claimant's daily activities; the duration, intensity, and frequency of the symptoms; precipitating and aggravating factors; the dosage, effectiveness, and side effects of medication; any functional restrictions; the claimant's work history; and the objective medical evidence. *See Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009).  *See also* SSR 16-3p, 2017 WL 5180304, at 7-8 (setting forth the relevant factors); 20 C.F.R. § 416.929(c)(3) (same).  However, the ALJ is not required to discuss each factor if he acknowledges and considers them before discounting a claimant's subjective complaints. *Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010).  While an ALJ is not free to disregard a claimant's subjective complaints merely because the objective medical evidence does not support them, he "may choose to disbelieve those subjective reports because there are inherent inconsistencies or other circumstances that cause the ALJ to question the reliability of the subjective reports." *Twyford v. Comm'r, Soc. Sec. Admin.*, 929 F.3d 512, 517-518 (8th Cir. 2019).

At the outset, the undersigned notes that the ALJ afforded significant weight to Plaintiff's subjective complaints.  He included several significant limitations in the RFC, restricting Plaintiff to frequent fingering and handling with no work involving constant vibration, and further limited him to simple, routine, repetitive work involving only occasional interaction with co-workers,

supervisors, and the public. (ECF No. 8, p. 20). To the extent that the ALJ did discount Plaintiff's subjective complaints, a review of the decision demonstrates that the ALJ adequately considered several of the relevant factors when doing so. The ALJ expressly cited 20 C.F.R. § 404.1529 and SSR 16-3p and discussed Plaintiff's allegations as contained in his function reports, hearing testimony, and medical records. (*Id.,* pp. 19-23).

The ALJ noted, for example, Plaintiff's reported activities and the inconsistencies in his subjective statements about them. (*Id.*, pp. 19-20). Plaintiff indicated that he needed reminders for personal care, could not do chores or stand long, could not pay bills due to brain fog, and did not go anywhere by himself due to nervousness, but he also reported that he was able to take medication without reminders, prepare simple meals, go out weekly, drive a car, shop in stores using a motorized buggy, could follow written and spoken instructions, and could handle stress well. (*Id.*, p. 19, 241-247, 275-281). Inconsistencies between Plaintiff's subjective complaints of disabling impairment and his daily activities are relevant to assessing his limitations. *Julin v. Colvin*, 826 F.3d 1082, 1087 (8th Cir. 2016). *See also, Phillips v. Colvin*, 721 F.3d 623, 631-632 (8th Cir. 2013) (an impairment is not severe when treatment enables the individual to engage in activities inconsistent with disability).

The ALJ also considered the medical evidence, including objective findings and observations of Plaintiff's various examiners, and the nature of, compliance with, and effectiveness of Plaintiff treatment prior to and during the relevant period. (ECF No. 8, pp 21-22). The ALJ observed, for example, that Plaintiff was diagnosed with HIV in 2009 and was treated with Dovato for this condition. (*Id.,* p. 22). Primary-care records indicate that prior to and throughout the relevant period Plaintiff's CD4 levels remained stable, and his viral load (VL) was undetectable. (*Id.,* pp. 22, 424-425, 430-431, 436, 438, 440, 555, 561-562, 564-565, 568). And, although

18

Plaintiff reported to his primary-care nurse that his lab results were "all good," he painted a different picture when testifying before the ALJ, stating he had "been on a roller coaster since day one" and that his levels "fluctuate up and down and up and down." (*Id.,* pp. 22, 50).

The ALJ additionally observed that although Dr. Norvill had referred Plaintiff for further evaluation of his bilateral carpal tunnel syndrome and ulnar neuropathy in August and September 2021, the record reflects no subsequent encounters for these conditions, and Dr. Norvill also noted that Plaintiff remained neurologically stable despite his pain-symptom complex. (ECF No. 8, p. 25). Plaintiff testified that he had not sought further treatment for carpal tunnel syndrome and ulnar neuropathy, stating, "I haven't gotten to that point. I was trying to work my way down, I guess." (*Id.,* pp. 50).

The ALJ also noted Plaintiff's treatment at Pain Treatment Centers of America, beginning in November 2021, for neck pain, head pain, lower back and leg pain, and diagnoses of cervical region spondylosis, inflammatory spondylopathies of the cervical region, lumbar region radiculopathy, chronic head pain, chronic pain syndrome, and long-term use of opiate analgesics. (ECF No. 8, pp. 22, 539-543). Records of these encounters consistently reflect that Plaintiff was advised against bed rest and to maintain current activities. (*Id.,* pp. 460, 476, 505, 542). Further, the ALJ noted Plaintiff's lack of further treatment by this clinic following his sequential drug tests in June and August 2021, which were positive for illicit substances, including methamphetamine and marijuana. (*Id.,* p. 22, 452, 460). *See Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir. 2014) (noting an ALJ may properly consider gaps in treatment history when assessing claims of debilitating symptoms).

Finally, the ALJ noted that records from Plaintiff's primary care and behavioral health providers showed Plaintiff's largely normal physical and mental-status examinations and the

control or stabilization of his various other conditions with medication. (*Id.,* pp. 22, 424, 430, 561-564, 574, 577, 580, 582-583, 586-587, 590). In January 2023, he reported that his insomnia was well controlled with medication, that his anxiety, depression, OCD, and Tourette's were a little better, and that his symptoms were stable on medication. (*Id.,* p. 562). In February 2023, he reported that his medication for treatment of ADHD/ADD was very effective, and in June 2023, reported that he was doing better on that medication and felt "motivated and organized" since starting it again. (*Id.,* pp. 577, 586-587). And his physical and mental-status examinations in 2023 were normal. (*Id.,* pp. 561-563, 574, 577, 586-587). If an impairment can be controlled by treatment or medication, it cannot be considered disabling. *Hensley v. Colvin*, 829 F.3d 926, 933 (8th Cir. 2016); *Mabry v. Colvin*, 815 F.3d 386, 391-392 (8th Cir. 2016).

It is evident from the foregoing discussion that the ALJ considered relevant factors and gave good reasons, which are supported by substantial evidence, for partially discounting Plaintiff's subjective complaints relative to the medical evidence. The consistency and weight of a claimant's subjective complaints and the medical and other evidence are matters primarily for the ALJ to decide, not the court. As such, the undersigned finds no error and defers to the ALJ's evaluation of this evidence pertaining to the assessment of Plaintiff's subjective complaints.

Turning to the ALJ's determination of Plaintiff's RFC, it is the claimant who bears the burden to demonstrate his RFC. *Vossen*, 612 F.3d 1011, 1016 (8th Cir. 2010), *cited in Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012). And as a medical question, it must be supported by some medical evidence of the claimant's ability to function in the workplace. *Lawrence v. Saul*, 970 F.3d 989, 995 (8th Cir. 2020). Thus, medical source opinions are considered when assessing a claimant's RFC. *Id.* However, there is no requirement "that every aspect of an RFC finding 'be supported by specific medical opinion.'" *Twyford*, 929 F.3d at 518 (quoting *Hensley*, 829 F.3d at

20

932).   The final determination is left to the ALJ, and it entails consideration of all relevant evidence, including the medical records, observations of treating physicians and others, and the claimant's own description of his limitations.  *Lawrence*, 970 F.3d at 995.

As the previous discussion shows, the ALJ properly considered the relevant medical and other evidence documenting Plaintiff's impairments before concluding that he had the RFC to perform a range of light work with limitations.  In addition to the foregoing evidence, the ALJ considered the opinion evidence from DDS medical consultants and Plaintiff's daily activities when formulating Plaintiff's RFC.  (ECF No. 8, pp. 23, 69-77, 80-88).  The ALJ deemed the consultants' physical assessments, which had limited Plaintiff to a full range of medium, unskilled work, unpersuasive.  (*Id.,* pp. 23, 74, 84-85).  He reasoned that these assessments did not adequately account for the effects of Plaintiff's pain and musculoskeletal symptoms, and he assessed a reduced range of light work, as previously noted, restricting Plaintiff to only frequent fingering and handling with no work involving constant vibration.  (*Id.,* p. 23).  He found the consultants' mental assessments to be persuasive, however, noting that they were supported by Plaintiff's treatment records reflecting normal mental-status examinations, as well as his testimony that he elected not to return to his job, reported that his medications lessened his headaches, and that he lives alone, can drive and shop, provides care for two dogs, and has friends whom he phones and texts.  (*Id.,* pp. 23, 71-73, 82-83).

Construed liberally, Plaintiff's Complaint and Appeal Brief identify no evidence that demonstrates Plaintiff's impairments preclude him from performing the reduced range of light, unskilled work assessed by the ALJ.  (ECF Nos. 2, 13). The question before the Court is simply whether a reasonable mind might accept the evidence as adequate to support the ALJ's decision. After careful consideration of the entire record, the Court concludes that the ALJ properly

performed the sequential analysis and substantial evidence in the record, as a whole, supports the RFC determination and the resulting decision that Plaintiff was not disabled within the meaning of the Social Security Act.

## IV.    CONCLUSION

Based on the foregoing analysis and discussion, the Court finds that the ALJ properly performed the sequential analysis, and that substantial evidence supports the ALJ's decision denying DIB benefits in this case.  Accordingly, the ALJ's decision is AFFIRMED.  Plaintiff's Complaint, therefore, is DISMISSED WITH PREJUDICE.

DATED this 27th of March 2026.

/s/ Mark E. Ford

HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE